GEORGE A. HORMEL AND COMPANY, APPELLANT, V. RANDALL D. HAIR ET AL., APPELLEES.

426 N.W.2d 281

Filed July 22, 1988.   No. 87-793.

Kevin J. Kinney, of Krukowski & Costello, S.C., Kelly S. Breen, of Laughlin, Peterson & Lang, and James W. Cavanaugh for appellant.

Laureen Van Norman and John F. Sheaff for appellee Commissioner of Labor.

BOSLAUGH, WHITE, and SHANAHAN, JJ., and GITNICK and GARDEN, D. JJ.

GITNICK, D.J.

This action involves an appeal from the judgment of the district court for Dodge County, which had affirmed the decision of the Nebraska Appeal Tribunal allowing unemployment compensation benefits to the claimants.

This appeal requires us to examine the activities of certain employees, hereinafter claimants, of George A. Hormel and Company, hereinafter Hormel, and of Hormel, which operates a meatpacking plant in Fremont, Nebraska, to determine if the activities of the claimants constituted a work stoppage and whether the claimants were improperly awarded benefits to which they were not entitled, pursuant to Neb. Rev. Stat. § 48-628 (Cum. Supp. 1986). Neb. Rev. Stat. § 48-640 (Cum. Supp. 1986) mandates that our review is de novo on the record made in the trial court of the proceedings tried before the Nebraska Appeal Tribunal of the Nebraska Department of Labor, which, therefore, requires us to retry the factual issues involved in the findings complained of and to reach independent conclusions therefrom. *Norman v. Sorensen*, 220 Neb. 408, 370 N.W.2d 147 (1985); *School Dist. No. 21 v. Ochoa*, 216 Neb. 191, 342 N.W.2d 665 (1984).

Hormel, the appellant and employer, operates meat

processing plants in Fremont, Nebraska, in Austin, Minnesota, and elsewhere. The claimants are 43 employees of Hormel at the Fremont plant, and all are members of the United Food and Commercial Workers Union Local 22. Hormel's Austin, Minnesota, plant was struck by Local P-9 of the international union on August 17, 1985, which for operational purposes resulted in shutting down the Austin plant. In an effort to broaden the impact of the strike at the Austin plant, the leadership of Local P-9 sought authority from the international union to extend picket lines to other plants, including the Fremont facility, but was unable to obtain such authorization.

At about the same time as the commencement of the strike at the Austin plant, a local organization was formed in Fremont, which was designated as the "United Support Group," with an announced purpose of supporting the efforts of Local P-9 in its bargaining efforts with Hormel, and which included members of Local 22 of the Fremont plant. Local 22 did not strike the Fremont plant, but approximately 80 of its members out of a work force of 860 employees failed to report for work on January 27, 1986. Local 22 did increase its dues structure because of the strike activities at other plant locations, and the revenues were distributed to the membership of the striking local unions. Also, at least one of its members did participate in an informational picket line at the Fremont plant established by Local P-9 of the Austin plant. It is unclear from the evidence whether any other members of Local 22 were actually manning the picket line at the Fremont plant, but the evidence does show the line was primarily manned by spouses of members of Local 22 and by other members of the United Support Group.

On January 27, 1986, Hormel was unable to operate the ham, skin, and fat line division of its Fremont operations due to the failure of a number of its employees to report for work, but all other operations of the plant did continue. Hormel commenced hiring replacement workers and was operational in all departments the next day. On January 29, 1986, all employees honoring the picket line gave formal notice to Hormel that they were honoring a legally established picket line and that they had not resigned their respective positions. Hormel thereafter notified all employees honoring the picket

line that they were being permanently replaced by new personnel.

In order to enlist the aid of the Nebraska Job Service in obtaining replacement employees, on February 13, 1986, Hormel and the leadership of Local 22 sent a joint letter to the office of the division of employment of the Nebraska Department of Labor, in which they jointly stated that there was no work stoppage at the Fremont plant.

The picket line established by Local P-9 remained at the Fremont plant until June 4, 1986, and all of the claimants refused to cross the picket line to return to other jobs. On June 4, 1986, all claimants who had not otherwise terminated their employment relationship with Hormel made an offer to return to work, and Hormel placed them on its preferential recall list.

All of the 43 claimants involved in this case filed claims for unemployment compensation benefits, and the Nebraska Department of Labor undertook an investigation to determine the propriety of the claims. At a conference with the claims deputy, Hormel's Fremont plant personnel manager advised that the picket line activity resulted in a 4.9-percent loss of production and a 2.9-percent loss of hours; that the Fremont plant sustained a reduction in production, but "not . . . anywheres (sic) near 25 percent," because it had to reassign certain of the workers it had and had to hire untrained replacement personnel; and that there was a reduction in the number of the work force of from 9.4 percent on January 27, 1986, to a reduction of approximately 2 percent by the end of the first week.

The Department of Labor determined there was no work stoppage due to a labor dispute at the Fremont plant and allowed benefits without any disqualification period, which determination was affirmed by the Nebraska Appeal Tribunal and, on appeal, by the district court for Dodge County. This appeal followed.

Hormel assigns as error the determination there was no work stoppage, as defined in § 48-628(d), as it contends the preponderance of the evidence demonstrated that the claimants' unemployment arose out of a labor dispute at the Hormel plant; that the claimants left their employment without

good cause as defined in § 48-628(a); and that the claimants failed, without good cause, to accept its offer of suitable work within the meaning of § 48-628(c).

Section 48-628(d) provides a two-part test for disqualification of a claimant's right to receive unemployment benefits, as it requires that the Commissioner of Labor must find (1) that the unemployment of the claimant is due to a work stoppage and (2) that the work stoppage results from a labor dispute.

There is no question but that a labor dispute existed when the claimants honored the picket line established by the Local P-9 membership at the Fremont plant and absented themselves from their employment. Hormel asserts that because a labor dispute existed and the claimants participated therein, and because the claimants financed the labor dispute which caused the work stoppage, the claimants should be automatically disqualified from receiving unemployment benefits.

Hormel supports its position by citing the case of *Baker v. General Motors Corp.*, 478 U.S. 621, 106 S. Ct. 3129, 92 L. Ed. 2d 504 (1986). However, that case is premised on a Michigan statute which specifically disqualifies claimants where " 'the individual's total or partial unemployment is due to a labor dispute in active progress . . .'," 478 U.S. at 622 n.1, and this is substantially different from the Nebraska Employment Security Law, Neb. Rev. Stat. §§ 48-601 et seq. (Reissue 1984 & Cum. Supp. 1986), which provides for a disqualification when the claimant's unemployment is caused by a work stoppage resulting from the labor dispute. "As a general rule . . . [a] provision which disqualifies employees from receiving benefits when their unemployment is caused by a stoppage of work due to a labor dispute refers to the employer's plant operations, rather than the employee's labor." 81 C.J.S. *Social Security* § 244 at 490 (1977). Therefore, the issue for determination is whether a work stoppage existed within the meaning of our Employment Security Law.

We have previously discussed the issue in our opinion in *Magner v. Kinney*, 141 Neb. 122, 2 N.W.2d 689 (1942), as to when and what constitutes a "work stoppage." In that opinion, we pointed out that a stoppage of work exists when a

substantial curtailment of work occurs in an employing establishment, and we look to the effect that the curtailment of work has upon the employer's operations produced by the labor dispute to determine whether it is substantial, rather than simply whether a cessation of work by the claimants occurred. "Substantial" has been defined to mean "material," "important," "massive," or "considerable in amount." Webster's Third New International Dictionary, Unabridged 2280 (1981). Accordingly, it becomes difficult to fix any definitive standard by which to gauge when a stoppage of work starts or stops.

In adopting this approach, its effect was to require a case-by-case review of the particular facts and circumstances unique to each case, because we adopted a fluid test to determine when a *substantial* curtailment of work commences, and we remain convinced that this commonsense approach is both logical and reasonable and is the interpretation and application under similar statutes of other jurisdictions. See cases noted in Annot., 28 A.L.R.2d 287 (1953). We further point out that since we adopted this standard in 1942, the Legislature of this state has not seen fit to reject the approach which we have taken, and Hormel's arguments for a more restrictive approach should more properly be addressed to that body.

The evidence as to whether a work stoppage exists is that a 4.9-percent loss of production occurred, together with a 2.9-percent loss of total work hours; that the plant personnel manager had stated to the investigating claims deputy that "he was almost certain production was not cut anywheres (sic) near 25 percent"; that the only affected production section within the plant, the ham, skin, and fat line, was shut down for 1 day; and that Hormel at no time experienced a total operational shutdown of its Fremont operations.

Additionally, the record reflects that Hormel filled approximately 98 percent of the affected positions by the end of the first week following the establishment of the picket line, and therefore, any potential stoppage of work ended when Hormel was able to resume substantially normal operations. Furthermore, we note that Hormel, itself, notified the division

of employment of the Department of Labor by letter on February 13, 1986, that there was no work stoppage at the Fremont plant, and this letter must mean exactly what it said.

While we agree that Hormel suffered a loss of productivity and experienced difficulties as a result of the displacement occasioned by the conduct of the claimants and that the profit margins of the meatpacking industry may be razor thin, as argued by Hormel, there is no evidence from the record that the loss in productivity of Hormel as a result of the claimant's actions negatively impacted on Hormel's profitability to any degree or to any significant degree. Hormel asks us to speculate on this point simply because product was not produced. We point out that it is just as reasonable to conclude that Hormel was losing money on its production before the claimant's actions as to conclude it was making money, when no evidence of the cost accounting impact of the absent production is available in the record. We decline to speculate on either conclusion.

We then conclude that neither individually nor collectively are the loss of productivity and difficulty experienced by Hormel of such severity as to amount to a substantial stoppage of work in this case, either on the plant as a whole or on the individual department affected, as the impact was not significant in either case, based on the evidence in the record.

Having determined that no work stoppage occurred within the meaning of the Employment Security Law, we need not address the other argument made by Hormel in support of its first assignment of error, as the determination that there was no work stoppage avoids any consideration under § 48-628(d) as to whether or not the claimants financed the labor dispute which caused the work stoppage by their contribution of union dues which may ultimately have reached the membership of other striking local unions.

Hormel then argues that the claimants are disqualified from receiving benefits because they effectively left their employment voluntarily and without good cause, as provided in § 48-628(a), by refusing to cross the picket line. As to this issue, we note in *Beaman v. Safeway Stores*, 78 Ariz. 195, 277 P.2d 1010 (1954), it was held that the fact that claimants

voluntarily left their employment as grocery department employees because they refused to cross a picket line established by meat department employees, where each department was separate, did not constitute refusal to accept suitable employment, and such claimants were not deemed unavailable for work and were, therefore, not ineligible for benefits. The court in that opinion stated at 199-200, 277 P.2d at 1013:

We do not believe the Court was correct in finding the claimants ineligible because of unavailability for work. Generally, the courts test whether one is available for work by whether the claimant is able, willing and ready to accept suitable work which he does not have good cause to refuse and is genuinely attached to the labor market. Muraski v. Board of Review, supra; Reger v. Administrator, Unemployment Compensation Act, 132 Conn. 647, 46 A.2d 844.

This does not mean necessarily that there are no possible conditions under which one may be considered available although not willing to accept certain suitable employment. Stated another way, he is eligible even if he refuses to accept suitable work without good cause if such refusal does not effectively remove his services from the labor market. If the refusal is for a cause and upon such conditions as so restrict his willingness to work that his services are rendered unmarketable, he has removed himself from the labor market and is ineligible. Unemployment Compensation Commission v. Tomko, 192 Va. 463, 65 S.E.2d 524, 25 A.L.R.2d 1071. In the event such refusal merely limits the field of suitable work · which he will not accept to an individual employer, he might be disqualified but he could not be said to be unavailable and removed from the labor market unless the circumstances warrant the conclusion he is unwilling in general to accept suitable work.

In the instant case all the claimants did was to refuse to work for one employer because of the existence of a picket line. A finding that such claimants were for this reason alone removed from the labor market and unavailable was not warranted.

Additionally, we note that the right of employees to engage in peaceful picketing for legitimate purposes has free speech aspects under the 1st amendment, which guarantees that the right of free speech will not be infringed by the federal government, and under the 14th amendment, which guarantees the same protections against infringement by the several states. *Thornhill v. Alabama*, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940). Furthermore, under the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (1982), the refusal to cross a picket line has been determined to be a protected activity. *N.L.R.B. v. Browning-Ferris Ind., Chem. Serv.*, 700 F.2d 385 (7th Cir. 1983).

Hormel lastly argues that claimants failed, without good cause, to accept an offer of suitable work in violation of § 48-628(c). A reading of the record in this case shows, however, that Hormel made no specific offer of work to the claimants, and no evidence appears as to which positions, if any, remained open, or whether Hormel made any offer to return the claimants to work after the hiring of replacement personnel. Since Hormel had "permanently replaced" the claimants with other employees, obviously their positions were no longer available. This conclusion is buttressed by the evidence that Hormel then placed the claimants on a preferential recall list, rather than immediately placing them for work.

Lastly, § 48-628(c) provides, in pertinent part, that "[i]n determining whether or not any work is suitable for an individual," a claimant shall not be denied benefits "[i]f the position offered is vacant due directly to a . . . labor dispute." There is no question that a labor dispute existed in this case between Hormel and Local P-9.

We conclude that the claimants were not disqualified from benefits on the ground that they had voluntarily refused to accept suitable work.

The judgment of the district court was correct in all respects, and we, therefore, affirm its decision that the claimants are entitled to receive their respective unemployment compensation benefits.

AFFIRMED.