IBP, INC., APPELLEE, v. DAVID D. AANENSON ET AL., APPELLANTS, VIRGINIA YUEILL, COMMISSIONER OF LABOR, STATE OF NEBRASKA, APPELLEE.
IBP, INC., APPELLEE, v. ANN ZOUKIS ET AL., APPELLANTS, VIRGINIA YUEILL, COMMISSIONER OF LABOR, STATE OF NEBRASKA, APPELLEE.

452 N.W.2d 59

Filed March 2, 1990.    Nos. 89-242, 89-243.

Thomas F. Dowd and Terry L. Inserra, of Thomas F. Dowd & Associates, for appellants.

John M. Guthery, of Perry, Guthery, Haase & Gessford, P.C., for appellee IBP.

John F. Sheaff and Laureen Van Norman for appellee Yueill.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This appeal arises out of separate orders of the district court for Dakota County reversing two separate decisions of the Nebraska Appeal Tribunal. The cases were consolidated for briefing and argument in this court, and both will be considered in this opinion. In the first case, *IBP, inc. v. Aanenson*, case No. 89-242, the trial court reversed the tribunal's decision which had awarded unemployment compensation benefits to defendants-appellants, David D. Aanenson and 2,037 other claimants (hereinafter collectively referred to as lockout claimants), from December 14, 1986, through March 14, 1987, the period in which IBP locked out the employees from their place of employment. In the second case, *IBP, inc., v. Zoukis,*

case No. 89-243, the trial court similarly reversed the tribunal's award of unemployment compensation benefits to Ann Zoukis and 2,037 other claimants (hereinafter collectively referred to as strike claimants) from March 16 through July 26, 1987, the period in which the employees were on strike.

All the claimants are hourly employees of IBP at IBP's Dakota City, Nebraska, meat slaughtering and processing plant. In addition to the facility located in Dakota City, IBP owns and operates nine other beef processing plants located in Washington, Texas, Nebraska, Kansas, Minnesota, Iowa, Idaho, and Illinois. The Commissioner of Labor is a party pursuant to Neb. Rev. Stat. § 48-638 (Cum. Supp. 1986).

In case No. 89-242, the commissioner originally denied the lockout claimants' applications for benefits, based on Neb. Rev. Stat. § 48-628(d) (Cum. Supp. 1986). Subsection (d) disqualifies an individual from receiving benefits

[f]or any week with respect to which the commissioner finds that his or her total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he or she is or was last employed . . . .

The commissioner held that the lockout and strike were labor disputes within the meaning of the section and determined with respect to case No. 89-242 that there was a stoppage of work caused by the labor dispute, and, thus, the section disqualified the lockout claimants from receiving benefits. In case No. 89-243, with respect to the strike claimants' applications for benefits, the commissioner determined that, although the strike continued through July, the work stoppage only continued to the week ending May 9, 1987, and that the strike claimants were entitled to compensation beginning May 3.

The Nebraska Appeal Tribunal, consisting of one administrative law judge, reversed the commissioner's decision in *Aanenson* with respect to the finding that a work stoppage existed. Although the tribunal agreed with the commissioner's findings that a lockout and a strike were labor disputes, the tribunal held that since IBP failed to prove that a work stoppage existed "at any time during the duration of the labor dispute," which included both the lockout period in *Aanenson*

and strike period in *Zoukis*, § 48-628(d) did not disqualify any of the claimants from receiving unemployment compensation benefits.

In June 1988, IBP filed petitions in the district court for a review of each decision. IBP contended that the tribunal erroneously determined that, at all times relevant to the decisions, there was not a stoppage of work which existed because of a labor dispute. IBP alleged that the tribunal erroneously construed work stoppage in terms of the entire operations of all of IBP's plants, when it should have limited its analysis of work stoppage solely to the operations of IBP's Dakota City plant.

The district court had before it the complete records of the foregoing administrative proceedings. Following a hearing in which additional testimony was adduced, the court made findings of fact and conclusions of law. For the purpose of determining work stoppage, the court restricted its analysis of "factory, establishment, or other premises," as that phrase is used in § 48-628(d), solely to the operations of IBP at the Dakota City plant. The court also determined, contrary to the lockout claimants' contention, that although IBP began substantial renovations while the plant was closed, that did not alter the fact that the work stoppage was caused by a labor dispute. In *Aanenson*, the court concluded that "but for the labor dispute, the employees would not have been locked out" of the plant, and "[s]ince there was 100% stoppage of work at the Dakota City plant during the time periods relevant to this appeal . . . the labor dispute, during that time period, did create a stoppage of work."

The court also denied the strike claimants' request for benefits during the strike period, upon concluding that the strike was a labor dispute and that there was a stoppage of work caused by such dispute at all times between March 16 and July 26, 1987. The lockout claimants and the strike claimants have timely appealed.

We first address the lockout claimants' appeal in case No. 89-242. In this court, the lockout claimants assign three errors, contending the district court erred (1) in restricting the meaning of "establishment" as used in § 48-628(d) to the Dakota City

plant, rather than applying it to IBP's entire operations; (2) in holding that a work stoppage existed at the Dakota City plant; and (3), assuming the existence of a work stoppage, in holding that the work stoppage was the result of a labor dispute and not of IBP's construction and renovation projects. We affirm the judgment in case No. 89-242.

Neb. Rev. Stat. § 48-640 (Reissue 1988), as amended in 1988, set out that we review appeals from the district court under the Employment Security Law in the same manner as we review appeals in civil cases generally. See Neb. Rev. Stat. § 84-918 (Supp. 1989). However, for cases filed before July 1, 1989, as was the case at bar, § 48-640 (Cum. Supp. 1986) is operative. Under that section, our review is de novo upon the record, and we must independently determine the issues of fact involved in the findings complained of and reach an independent conclusion therefrom. *George A. Hormel & Co. v. Hair*, 229 Neb. 284, 426 N.W.2d 281 (1988).

The record shows the following facts with regard to the lockout. In the fall of 1986, negotiations for a new collective bargaining agreement were underway between IBP and the employees' bargaining unit, United Food & Commercial Workers International Union, Local 222. During the negotiations, IBP stated that it would not agree to an extension of the existing contract under which the parties were currently operating in the event a new contract was not agreed to before the existing contract expired. Negotiations for a new agreement reached an impasse, and on December 13, 1986, the contract expired, leaving the parties without an agreement. On that day, IBP extended an offer to the union. That offer was immediately rejected by the union members, although the members counteroffered to continue working under the terms of the former contract. IBP rejected that offer, and on December 14, IBP instituted a lockout of employees from its Dakota City plant.

It is uncontroverted that a labor dispute existed at the Dakota City plant on December 14, 1986, when IBP ceased operations and instituted a lockout of employees from the plant. IBP does not dispute the fact that on the day after it instituted the lockout, IBP also launched substantial

construction and renovation projects at the plant.

In January 1987, IBP renewed its same offer to the union, but that offer was again rejected by the union members. Finally, on March 13, 1987, IBP simultaneously lifted the lockout and extended an offer to the union permitting the employees to return to their jobs on March 16 at the terms of IBP's newest offer. The union members refused to return to work and voted to strike. The strike began March 16, 1987. The lockout claimants seek unemployment compensation benefits from December 14, 1986, through March 14, 1987, the period in which they were locked out of the Dakota City plant.

The lockout claimants do not assign error in the district court's finding that the lockout was a labor dispute within the meaning of § 48-628(d). Regarding the first assigned error, the lockout claimants contend that IBP's facilities "are interdependent with each other and constitute a single establishment" within the meaning of § 48-628(d). Brief for appellants at 38. The lockout claimants wish us to adopt the conclusion of the tribunal that " 'factory, establishment or other premises' is not an enumeration. All of the words are generic. They refer generally to a business, enterprise or concern."

Specifically, the lockout claimants contend that all of IBP's plants are functionally interdependent and that no work stoppage occurred in view of IBP's synchronized multiplant operations. In support of their position, the lockout claimants presented the testimony and report of an economist. That evidence suggested that the levels of production at any given IBP plant are constantly adjusted in response to the cost of cattle near the various plant locations. The lockout claimants also offered the weekly slaughtering and processing reports, as well as a report filed with the Securities and Exchange Commission by Occidental Petroleum Corporation, IBP's parent company. The slaughtering and processing statistics indicated that at the time the plant in Dakota City was shut down, IBP's other plants increased production. Similarly, in the report to the Securities and Exchange Commission, Occidental stated that when the Dakota City plant ceased operations, "substantially all of the plant's production was absorbed by

other IBP plants." The lockout claimants submit that this evidence, as a whole, proves that there was a high level of synchronization within IBP's multiplant operations and that by defining the word "establishment" in terms of IBP's overall operations, the evidence would show that no work stoppage occurred during the lockout.

While the evidence presented discloses that some of IBP's other plants increased production while the Dakota City plant was shut down, and conceivably could indicate that a calculated shift in production occurred within IBP's multiplant operations to offset the loss of production in Dakota City, we are not persuaded by the lockout claimants' argument that the word "establishment," as used in the disqualification section, should be so broadly construed in the case before us as to encompass the entire multiplant operations of IBP. In defining "factory, establishment, or other premises" for the purpose of ascertaining whether a stoppage of work existed, as contemplated by § 48-628(d), the district court concluded that the words "establishment" and "premises" "are so commonly understood as units of place that further definition is superfluous." We agree. Other jurisdictions, in defining "establishment," use concepts of physical proximity and location. See, *Dunaway v. Department of Labor*, 99 Ill. 2d 417, 459 N.E.2d 1332 (1984); *Ahnne v. Dept. of Labor & Indus. Rel.*, 53 Haw. 185, 489 P.2d 1397 (1971); *Walgreen Co. v. Murphy*, 386 Ill. 32, 53 N.E.2d 390 (1944). In *Ahnne, supra*, the Hawaii Supreme Court stated: " '[E]stablishment' should be given its natural meaning. It can refer to a building or group of proximate buildings, but, generally speaking, it should not refer to locations many miles apart." 53 Haw. at 191, 489 P.2d at 1401. Under this test, "establishment" cannot be construed to include IBP's entire corporate operations spread over eight states.

Defining "establishment" in terms of a distinctly physical place is supported by our previous decisions. See, *George A. Hormel & Co. v. Hair*, 229 Neb. 284, 426 N.W.2d 281 (1988); *Magner v. Kinney*, 141 Neb. 122, 2 N.W.2d 689 (1942). While the word "establishment" has not been specifically defined by this court, our previous determinations of work stoppage

involved distinctly physical locations. For instance, in *George A. Hormel & Co., supra*, the Nebraska dispute occurred at a single meat processing plant in Nebraska. In *Magner, supra*, the dispute was concerned with the physical premises that housed a trucking company in Omaha. Furthermore, in *Magner*, the court determined that the dispositive question in that case was whether the "unemployment [was] due to a 'stoppage of work' at the place of employment where last employed." 141 Neb. at 129, 2 N.W.2d at 693.

The lockout claimants contend that we should look beyond the place of the facility to the functional integration of IBP's entire corporate operations. Under the functional integration theory, the operations of separate facilities are considered as a whole to determine whether a work stoppage exists because of a labor dispute. However, this mechanism is applied only if it is proven that the facility in which there has been a work stoppage depends upon the other facilities or divisions for the functions assigned to it. Nearly all such cases involve manufacturing where products, in various stages of production, move from plant to plant in a highly synchronized fashion. See, e.g., *Ford Motor Co. v. Abercrombie*, 207 Ga. 464, 62 S.E.2d 209 (1950).

The facts in this case do not fit the functional integration theory. IBP's Dakota City plant processes orders independently from other IBP plants and furnishes no product to any other IBP facility. The Dakota City plant does sometimes receive carcasses from three plants that do not have processing operations, but those carcasses are also furnished to three other IBP plants. IBP's Dakota City plant is functionally independent, and no plant depends on it to supply different components of a finished product. Functional integration analysis does not apply to this case. We find that "establishment," as used in § 48-628(d), refers solely to IBP's Dakota City plant.

The statistical evidence the lockout claimants have presented regarding IBP's multiplant operations is irrelevant to the determination concerning the second assignment of error of whether a work stoppage occurred. This court has held that a work stoppage exists when it is proven that there has been a substantial curtailment of work produced by a labor dispute in

an employing establishment. *George A. Hormel & Co., supra.* See, also, *Magner, supra.* In *Magner*, we observed that "the technical meaning of the term, 'stoppage of work,' as used in our disqualification clause, is a substantial curtailment of work in an establishment, not the cessation of work by the claimant or claimants." 141 Neb. at 128, 2 N.W.2d at 692.

The central factor relating to a work stoppage in the case at bar pertains to the production figures of the Dakota City plant. There is no question but that the plant completely ceased slaughtering and processing operations during the lockout. The only conclusion that can be derived from this evidence is that there was a 100-percent curtailment of production at the Dakota City plant while the lockout was in progress. We find that a stoppage of work occurred at the plant during the time of the lockout. The lockout claimants' second assignment of error is without merit.

In their third assignment of error, the lockout claimants contend that even if there was a stoppage of work, it was not due to the labor dispute but, instead, was the result of a predetermined plan on IBP's part to close the plant for major renovation. They contend that IBP refused to let the employees work without a contract, thus enabling the company to accomplish its construction objectives under the pretext of a labor dispute and to save the cost of increased payments to the unemployment fund because the employees would have been entitled to unemployment compensation had they simply been laid off when the plant closed for renovation.

Specifically, the lockout claimants allege that while construction was underway at the plant, IBP stalled contract negotiations by extending insincere offers which the union would only refuse and by placing a 1- to 2-day limitation on its first two offers to the union. Additionally, the lockout claimants allege that IBP did not provide a standing offer until construction was nearly complete, and suggest that IBP could not afford to extend an offer that might be accepted while the renovation was in progress, because had the union members accepted such an offer, IBP would have been forced to lay off the employees to complete construction.

IBP has acknowledged that it instituted major renovation

projects at the time of the lockout. We find, however, that the projects were contemplated well in advance of the lockout and were to be implemented regardless of the outcome of the contract negotiations. The major renovations consisted of electrical and mechanical work on a trim conveyor and on a material and handling system and installation of new Cryovac machines. Undisputed testimony shows that new Cryovac machines had been installed at every other IBP processing location without shutting down operations.

We also find that the work stoppage was not caused by the renovations. An IBP officer testified that the decision to institute a lockout was not based on the board's decision to renovate the plant. IBP testimony was submitted showing that the renovations would have been instituted regardless of the lockout. This is evidenced by the fact that IBP requested that the bids submitted for the renovation projects be in two forms. One bid was figured without project interruption, assuming no employees were at the plant. The other was based on the cost to do work on weekends and at night, around the employees' work schedules for normal operations. A contractor hired to perform some of the renovation projects testified that upon submitting bids, he was instructed to submit a proposal bearing in mind that work was to be done around production schedules. An electrical contractor hired to perform work in IBP's crane storage area testified that when the lockout began, he was directed to perform the projects in 72-hour segments, which would enable the employees to return to work as soon as possible in the event an agreement was reached.

When the negotiations reached an impasse and IBP decided to shut down the plant, it was no longer necessary for the construction workers to work around the IBP employees' schedules. IBP made a business decision to have a contingency plan ready to be implemented notwithstanding the outcome of the contract negotiations. In short, the evidence affirmatively establishes that the labor dispute, not the renovations, was the cause of the unemployment of the claimants, and we so find.

We hold that the lockout claimants are disqualified from receiving unemployment compensation, pursuant to § 48-628(d), for the period of the lockout, December 14, 1986,

through March 14, 1987. The trial court's decision in case No. 89-242 is affirmed.

In case No. 89-243, the strike claimants appeal the order of the court denying benefits for the period of the strike, from March 16 through July 26, 1987. They assign three errors, which may be consolidated into two: (1) The trial court erred in finding there was a work stoppage at IBP's Dakota City plant at any time during the strike period, and (2), in any event, the court erred in holding that IBP did not resume normal operations during the week ending May 9, 1987, as determined by the Commissioner of Labor.

We find that the strike claimants' first assignment of error is without merit. The record shows that after the strike began on March 16, 1987, there was no slaughtering at the plant until the week ending April 4, 1987. Similarly, between March 16 and April 4, 1987, a total of 10,120 units were processed, as contrasted with a normal combined production amount of approximately 55,000 units per week. It is clear that, at least during those periods, a work stoppage existed. The strike claimants' first assignment of error is without merit.

The difficulty is in determining when the work stoppage ceased. The tribunal did not reach that issue because in applying its theory, as described above in the lockout discussion, that any lost production at the Dakota City plant was made up by production at IBP's other plants, the tribunal determined there was never any work stoppage. We did not adopt this approach in determining the lockout question, and we will not adopt it in determining the strike issues.

The Commissioner of Labor, in her decision, determined that the work stoppage ceased to exist during the week ending May 9, 1987, and that if the strike claimants were otherwise eligible, they were entitled to unemployment benefits as of May 3, 1987.

The trial court, however, determined the work stoppage continued until the strike ended on July 26, 1987. Both the commissioner and the district court relied on production figures from the Dakota City plant in reaching their divergent decisions. Where they disagreed was in their determinations of what represents normal production, or, in other words, how

many head of cattle on the average were slaughtered and/or processed at the plant during any given week. IBP admits this is a difficult determination to make because of market variance. The commissioner arrived at an average based on the plant's production figures for the 4 weeks preceding the lockout. The district court declined to use the 4-week timeframe, based on testimony that the 4-week period did not accurately represent average weekly production because it contained the two lowest weeks of production for the preceding year. The district court held that the production figures for the entire year preceding the lockout were more representative of average weekly production. From December 14, 1985, to December 13, 1986, IBP's plant slaughtered and/or processed approximately 55,000 head of cattle per week. The district court compared that average with the production figures during each week of the strike. Based on these comparisons, the court found that the weekly production during the strike never exceeded 70 percent of the average. The court concluded that the decrease in production was substantial at all times during the strike.

Stoppage of work, as used in the disqualification clause, refers to a substantial curtailment of the employer's operations. In *George A. Hormel & Co. v. Hair*, 229 Neb. 284, 289, 426 N.W.2d 281, 284 (1988), we said:

> "Substantial" has been defined to mean "material," "important," "massive," or "considerable in amount." [Citation omitted.] Accordingly, it becomes difficult to fix any definitive standard by which to gauge when a stoppage of work starts or stops.
>
> In adopting this approach, its effect was to require a case-by-case review of the particular facts and circumstances unique to each case, because we adopted a fluid test to determine when a *substantial* curtailment of work commences, and we remain convinced that this commonsense approach is both logical and reasonable and is the interpretation and application under similar statutes of other jurisdictions. [Citation omitted.]

The question before us, then, is how long the plant's operations, which we have determined were substantially curtailed as of April 4, 1987 (when IBP started up its

slaughtering operations after the lockout), remained curtailed because of the strike. Section 48-628(d) requires that this be a continuing determination made on a week-by-week basis.

The burden of proof is on the claimants to show that they were qualified to receive benefits. If the employer has a defense to qualification, the employer must prove such defense. However, if the claimants contend that they fall within an exception to the defense, the burden is on the claimants to prove the exception. *A. Borchman Sons v. Carpenter*, 166 Neb. 322, 89 N.W.2d 123 (1958). The parties have stipulated that the exceptions enumerated in § 48-628(d) do not apply. If the strike claimants are otherwise qualified to receive benefits, IBP must prove disqualification under § 48-628(d).

In *Magner v. Kinney*, 141 Neb. 122, 2 N.W.2d 689 (1942), we denied the claimants benefits upon finding that the stoppage of work at the employer's business had been substantial. The employer had experienced a decrease of its total business transactions in excess of 30 percent. In the *Magner* case, the court set out other factors that entered into its determination of work stoppage, including the facts that the strikers had abandoned their employment and had proceeded to interfere with the employer's business. It appears that since *Magner*, the 30 percent figure has operated as a rigid rule for determinations as to the existence of work stoppage. This was not our intent and ignores our continued position that work stoppage must be determined by the facts and circumstances unique to each case. When facts and circumstances clearly warrant a finding as to the existence or nonexistence of work stoppage, we see no reason why that finding should change simply because the employer's operations are at 71 percent of its normal operations, rather than at 69 percent. These numbers show the difficulty that comes with blindly adhering to statistics in determining work stoppage. The issue is not that clear.

In this case, the factors that reflect whether there has been a substantial curtailment of operations are the levels of production, the number of workers employed at the plant, and the number of hours they worked while the labor dispute was in progress. The record contains figures of the plant's weekly production as divided into slaughter, processing, and extension

processing. Although we agree that actual production during the strike never exceeded 70 percent of normal, we do not agree that production figures alone are sufficient to establish a work stoppage in this case.

With respect to the number of employees working during the labor dispute, the record shows that IBP resumed operations at the plant in March 1987 and hired new workers in addition to some returning employees. Maurice McGill, IBP's executive vice president of finance and administration, testified at the court hearing that IBP was not functioning with a full work force until after the strike ended. We find that while operations continued during the strike, the foregoing indicates that operations remained substantially curtailed at the plant during the beginning week of the strike and, thus, there continued to be a work stoppage for some time after the lockout converted into a strike.

IBP concludes that since the work stoppage was originally caused by the labor dispute, the claimants should have been denied benefits until the labor dispute was over. However, other jurisdictions having similar or identical language to § 48-628(d) have recognized that work stoppage is not necessarily coterminous with the underlying labor dispute. In *Crescent Chevrolet v. Dept. of Job Serv.*, 429 N.W.2d 148 (Iowa 1988), the court recognized that work stoppage and labor dispute are independent conditions and further acknowledged that a stoppage of work may end before the resolution of the underlying labor dispute. See, also, *Inter-Island Resorts v. Akahane*, 46 Haw. 140, 377 P.2d 715 (1962), a case which dealt with the application of a disqualification statute nearly identical to Nebraska's.

IBP's interpretation disregards the language of § 48-628(d) which requires that the work stoppage exist "because of a labor dispute" and which further requires that such determination be made upon a week-by-week basis. While the labor dispute may have been the initial cause of the work stoppage, each week of unemployment is the subject of a separate determination and, thus, it is possible for the cause of the stoppage to shift to something other than the labor dispute. See, generally, *High v. Com., Unemployment Comp. Bd. of Rev.*, 505 Pa. 379, 479

A.2d 967 (1984). In other words, one who has been disqualified from receiving benefits under § 48-628(d) can avoid continued disqualification if his employer fails to prove that for each week in question, the cause of the work stoppage is the labor dispute.

In *Inter-Island Resorts, supra,* the Hawaii Supreme Court awarded striking employees benefits upon finding that the stoppage of work ceased during the strike because resumption of substantially normal operations occurred within a week after the strike began. In recognizing the policy concerns involved with awarding benefits to strikers, the Hawaii Supreme Court stated:

> "[O]n the one hand lies the charge that to allow compensation in such a case as this would be, in effect, to force employers and the state to finance a strike. On the other hand, it is claimed that to deny it would be to deny aid to those whom, among others, the Act was designed to protect (i.e., those who had participated in a labor dispute and lost — at least to the extent that others now had their jobs and their former employer's operations had been fully resumed). And that finally, a denial of compensation would seriously cripple their unquestioned right to strike. At the outset it should be made clear that this court is not concerned with any questions relative to the merits of the labor controversy itself. Our decision is not and cannot be determined by such factors. Instead it is determined by the choice that the elected legislative representatives of the people of this state have made for us. . . ."

46 Haw. at 151-52, 377 P.2d at 722 (quoting *Sakrison v. Pierce,* 66 Ariz. 162, 185 P.2d 528 (1947)).

In some jurisdictions the causal connection between a stoppage of work and a labor dispute is severed when an employer is able to hire a sufficient number of permanent workers to replace the strikers and to resume normal operations. See, *Crescent Chevrolet, supra; Union Starch & Refining Co. v. Dept. of Labor,* 8 Ill. App. 3d 406, 289 N.E.2d 692 (1972). While the hiring of permanent employees may be considered, we hold that the causation depends on the pertinent facts and circumstances of each case.

The strike claimants contend that IBP's decision to keep the

extension facility closed throughout the strike period is crucial to the finding that the labor dispute was not the cause of the work stoppage through the end of July. The extension facility in the IBP Dakota City plant is a division of processing which basically does the same kinds of things as the main processing plant but which happens to be a small separate unit. By May 9, 1987, the main processing facility resumed 61 percent of its production for the previous year. The slaughter facility remained substantially low in production throughout the strike. The extension facility did not resume any production until after the strike was over. We find nothing in the record to account for this. The strike claimants point out that IBP's decision to keep the extension facility closed caused the stoppage of work because, during the dispute, IBP admittedly had more than enough applicants to resume operations at its plant, including the extension facility.

If IBP had started up the extension facility at the time it started up its other operations, the plant would have resumed substantially normal operations by May 9, 1987, as shown by the following. The record indicates that the extension facility, by itself, processed on the average approximately 9,700 head of cattle per week. Had the extension facility resumed operations in late March or early April, when the other divisions were starting back up, the number of units processed at the plant would have reached 70 percent of average weekly production by May 9, 1987. In *Crescent Chevrolet v. Dept. of Job Serv.*, 429 N.W.2d 148, 152 (Iowa 1988), the Iowa Supreme Court stated: " 'It is generally agreed by the courts that a "stoppage of work" and its resultant disqualification for unemployment benefits may continue until the employer has had a reasonable time to resume normal operations . . . .' " IBP had a reasonable amount of time to regain production in the extension as of May 9, 1987, and to return to substantially normal operations in its entire Dakota City plant as of that date.

If the extension facility had resumed operations at the time the other divisions started back up, the plant would have resumed substantially normal operations as of May 9, 1987, because IBP could have been operating with close to a full work force by that date. The record shows that by May 9, 1987, there

were approximately 1,860 hourly employees working at the plant. Thereafter, this figure steadily increased. McGill testified that by May or June, the replacement employees and the returning strikers numbered approximately 2,000. There were also 20 to 40 supervisors working in processing and 10 to 15 supervisors working in slaughtering. Other testimony showed that the extension employed between 500 to 600 employees. It is clear that additional workers would have been employed had the extension facility resumed processing operations at the time the other operations were resumed. In light of the fact that there were adequate applicants, the number of employees working at the plant would have increased several hundred, nearing the original number of employees.

McGill testified that IBP "chose not to open the extension [facility] regardless of the number of applicants" it had for the positions left open by the strikers until after the strike was over. It is clear that at this point, the reason for the work stoppage was primarily a management decision to leave the extension facility idle and that the labor dispute did not create a reduced number of applicants preventing IBP from opening the facility. Admittedly, the initial cause of the work stoppage was the labor dispute, but IBP has not shown that the labor dispute continued to prevent IBP from resuming substantially normal operations.

In determining when an employer's operations return to substantially normal, the Arkansas Supreme Court, in *Monsanto Chemical Co. v. Commr. of Labor*, 229 Ark. 362, 366, 314 S.W.2d 493, 496 (1958), stated: "It is of course apparent that if a resumption of completely normal operations were required, the employer could continue the stoppage indefinitely by leaving a small department of his plant idle." Moreover, it is generally held that "the Employment Security Law is to be liberally construed in order to accomplish its beneficent purposes." *Hanlon v. Boden*, 209 Neb. 169, 174, 306 N.W.2d 858, 861 (1981). We find that the decision to keep the extension facility closed and, thus, to operate with a reduced work force at decreased production caused the work stoppage during the week ending May 9, 1987, and thereafter.

Finally, IBP contends that if we find the strike claimants were not disqualified from receiving benefits based on § 48-628(d),

they should nevertheless be disqualified under § 48-628(c) for failing, without good cause, to accept suitable work when offered to them by IBP. *George A. Hormel & Co. v. Hair*, 229 Neb. 284, 426 N.W.2d 281 (1988), is dispositive of this issue. In that case we noted that a refusal to cross a picket line is a protected activity and there had been no showing that the strike claimants were unavailable for work for any other reason.

We hold that the strike claimants are entitled to benefits for the foregoing period and thus modify the order of the district court in that regard, and determine that the strike claimants are entitled to benefits beginning May 3, 1987, to the end of the strike on July 26, 1987.

JUDGMENT IN NO. 89-242 AFFIRMED.
JUDGMENT IN NO. 89-243 AFFIRMED AS MODIFIED.