## LLOYD E. MITCHELL, INC. *v.* MARYLAND EMPLOYMENT SECURITY BOARD ET AL.

[No. 63, October Term, 1955.]

238

*Decided March 7, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Frank A. Kaufman,* with whom were *Joseph Bernstein, Oscar M. Lemoine, Jr.* and *Frank, Bernstein, Gutberlet & Conaway,* on the brief, for appellant.

*Bernard S. Melnicove, Special Assistant Attorney General,* and *James N. Phillips, Attorney for Maryland Employment Security Board,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

Certain employees of the appellant corporation, who were unemployed during a period from June 20, 1952, to July 28, 1952, filed claims for benefits under the Maryland Unemployment Compensation Act, Code (1951), Art. 95A. After testimony had been taken before a special examiner, the Maryland Employment Security Board found that they were entitled to benefits and the finding was affirmed on appeal to the Superior Court. The employer appeals from that decision, contending that the claimants were disqualified because of participation in a labor dispute.

Code (1951), Art. 95A, sec. 5(e) provides that an individual shall be disqualified for benefits "For any week with respect to which the Board finds that his un-

employment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this sub-section shall not apply if it is shown to the satisfaction of the Board that—(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *." Sec. 6(h) provides that "In any judicial proceeding under this section, the findings of the Board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law." Sec. 6(h) further provides for an appeal to this Court "in the same manner, but not inconsistent with the provisions of this Article, as is provided in civil cases."

The construction of the statute, as applied to undisputed facts, is, of course, a question of law. *Emp. Security Bd. v. Md. Deliveries,* 204 Md. 533, 537; *Robinson v. Md. Emp. Sec. Board,* 202 Md. 515, 518; *Celanese Corporation v. Bartlett,* 200 Md. 397, 405. If a finding of fact is supported by evidence it is conclusive. *Tucker v. American S. & Ref. Co.,* 189 Md. 250, 252; *Md. Emp. Security Bd. v. Poorbaugh,* 195 Md. 197, 199. For present purposes we need not consider whether the evidence referred to in the statute must be substantial or only legally sufficient. Both expressions have been used in the cases cited. The appellees concede that the burden is upon the claimants to show that they fall within the exceptions to the disqualifications set forth in sec. 5(e). It is undisputed that there was a stoppage of work at their place of employment due to a labor dispute between other parties, so that the proviso comes into play and the claimants must show affirmatively that they did not participate in the labor dispute.

At the hearing before the special examiner held October 10, 1952, it was stipulated by all the parties that beginning on June 2, 1952, there was a complete stoppage of work at the Sparrows Point plant of the Bethlehem Steel Company because of a labor dispute between the Committee for Industrial Organization (C. I. O.) and the Bethlehem Steel Company. When the steel strike began, there were approximately twenty-two independent contractors engaged on various construction contracts with the Steel Company at its Sparrows Point plant. Operations on these jobs continued without interruption until June 20, 1952, when the C. I. O. officials announced that they would discontinue recognizing and honoring the passes of the various contractors' workers, most of whom were members of the American Federation of Labor (A. F. of L.). The appellant corporation was performing a construction contract with the Bethlehem Steel Company, and its workers were unemployed from June 23 to July 28, 1952, when the steel strike was settled and all the operations were resumed.

The issue presented to the Board that reviewed the testimony taken was as to the real cause of the unemployment. The claimants did not report for work on June 23. The appellees contend that this did not amount to participation in the labor dispute because the employer had indicated by its actions in securing its equipment on June 20 that no work was available. The appellant contends that the employees did participate in the labor dispute because their failure to report was due to an unwillingness to cross the picket lines without passes. It argues that its action in suspending operations was due to its reasonable belief that the employees would not report, and that in any event work would have been available if the men had reported.

It is undisputed that on the morning of Friday, June 20, 1952, the officials of the C. I. O. decided not to honor any more passes issued to the workers of outside contractors, authorizing their entry into the plant. Mr. Michel, the manager of the appellant in charge of the

job, testified that he heard of this from his foreman and others, and tried to ascertain whether his workers would report on Monday, the 23rd. One worker had said he would not cross picket lines. He talked on the telephone to Mr. Dubriel, business representative of the Steam Fitters Union Local, and asked him what action would be taken by the Union. Dubriel told him he did not know. He then called Mr. Ellis, president of the Building Trades Council, who told him he had nothing official to tell him. "I finally came to the conclusion from what I heard that they were going to stop the men from going into the Plant. I called my foreman to go and carry out a plan that we had had before * * *. I got in touch with Mr. Ellis and he said officially the C. I. O. would not honor the passes and I would not have any men as of Monday, the next working day." In the afternoon he proceeded to lay up his equipment. Small tools were placed in the field shacks, along with most of the eighty-three welding machines and the cat crane wires. Four cat cranes were left in place. Four cranes were moved out of the plant. A few days later, one of these was sent to Reisterstown on another job; another was painted and minor repairs made at a company shop located near Jolly Post Tavern, just outside the plant. The other two were stored nearby. About twenty-five of the one hundred and thirty men who were on the job Friday were referred to other jobs. None were laid off, except two clerks in his office. It was the practice when men are laid off to pay them forthwith, but in this case, none of the men were paid until the next succeeding pay day. He went to the repair shop on Monday, and into the Bethlehem plant. He had told three men to report for work at the repair shop. He did not tell any of the men to report for work at the plant on Monday, nor did anyone ask if work would be available. He testified positively that if the men had reported, work would have been available. It would have been an easy matter to reassemble the equipment for operation. He took the

preventive measure of securing the equipment because he felt sure the men would not come in on Monday.

Mr. Mundorf, business representative of the Operating Engineers' Local, testified he was at the Bethlehem plant on the afternoon of the 20th, and saw the equipment being moved and secured. He did not talk to any Company official. The men did not tell him they had been laid off. They did not enter the premises after the 20th, because they had no passes. Mr. Dubriel admitted talking to Mr. Michel, but testified that Mr. Michel told him some of the men would be transferred to other jobs, and some would be laid off. Mr. Dubriel did not tell the men to report, or not to report. He admitted that in six years he had never known his union workers to cross picket lines without passes, except in one instance. Mr. Hunter, business representative of another local, testified that a truck driver told him that he had been laid off on Friday, they had closed the job down. He did not know whether the men would have been willing to cross the picket lines or not. Mr. Ellis testified that he only talked to Mr. Michel once on Friday, and did not tell him the men would not come to work; that was up to the men. When asked if his experience would lead him to believe that the members of the unions associated with the Trade Council would cross picket lines, he replied: "I wouldn't know." He thought it would lead to violence if they did.

It is well settled that a voluntary failure or refusal by workers, members of a non-striking union, to pass through a picket line established by members of another union at the place of employment, constitutes participation in a labor dispute. *Brown v. Md. Unemp. Comp. Board,* 189 Md. 233, 243, and cases cited. This rule is in accord with the great weight of authority. See Note 28 *A. L. R.* 2d 287, 333. Failure to pass a picket line may be excused, however, if due to a justifiable fear of threatened violence that is supported by evidence, for in that case the failure is considered to be involuntary. *Steamship Ass'n v. Unemp. Comp. Bd.,* 190 Md. 215, 221. This rule has also been widely accepted. In the instant case

there was no testimony as to threatened violence, except that Mr. Ellis testified that one iron worker, seeking employment, had had an altercation with a picket prior to June 20, and had been arrested for using profane language, but not fined. This falls far short of the violence threatened in the *Steamship Ass'n* case, which is not in point here. Cf. *Baldassaris v. Egan*, 68 A. 2d 120, 121 (Conn.). On the other hand, in the instant case, there was no testimony of a downright refusal of individual employees to cross the picket line, except in one instance.

Three Illinois cases seem to be most nearly in point. In *Outboard, Marine & Mfg. Co. v. Gordon*, 87 N. E. 2d 610, 618 (Ill.), certain factory employees were on strike, and claims were filed by office workers who were denied admission to the plant. The plant gates were locked, and the guard was instructed by the management not to allow anyone to enter without a pass. The court said: "There is no doubt but that the management agreed to the restriction involved. * * * The management desired to preserve good relations with its employees and prevent violence because they would need these good relations in the future operation of their company. The factory union, on the other hand, desired a complete stoppage. Although the purposes of the said union and the company management were in no way similar, both parties did agree on the pass method for entrance, and the office employees were the innocent victims of this agreement." The allowance of the claims was affirmed.

But in *American Brake Shoe Co. v. Annunzio*, 90 N. E. 2d 83, 85 (Ill.), the *Outboard, Marine* case was distinguished on the ground that the employer had made it physically impossible for the employees to enter. The court stressed the fact that in the case at bar there was nothing in the record to show that there was no work available for the claimants to perform, or that the Company desired that they stay away from work. There was also testimony by one of the claimants that he had failed to report because he did not care to be classified as a "scab". The trial court, which reversed the finding

of the Director of Labor, was affirmed, on the ground that the decision of the Director of Labor was contrary to the manifest weight of the evidence. Again, in *Local Union No. 222 v. Gordon,* 92 N. E. 2d 739, 743 (Ill.), the court said: "We cannot see how the plaintiffs in this case can be any more entitled to benefits than plaintiffs were in the American Brake Shoe case because the substance of the terminating arrangements of the negotiations merely were that both the union and the employer understood that Local Union 222 would respect the picket line and, therefore, there would be a work stoppage."

It is true, as we have stated, that in the instant case there was only slight testimony of a refusal by the claimants to cross the picket line, but we think the inference is irresistible that they were unwilling to do so, and that this was well understood by all of the parties. That such was their motive was admitted by one of the witnesses for the claimants. The testimony that work would have been available, had the employees reported, is virtually uncontradicted, as is the testimony that the Company was anxious to get on with the job and had no reasonable apprehension of violence. If it can fairly be said that neither the employer nor the employees were anxious to force the issue, it is also true that the employer did not put it out of his power to go on with the work.

We think the burden upon the claimants to show that they were not participating in the labor dispute is not met by a mere showing that the employer secured its equipment before an actual test. In *Climax Fire Brick Co. v. Unemployment Comp. Bd. of Rev.,* 72 A. 2d 300 (Pa. Sup.), it was held that an employer was justified in shutting down his plant as a precautionary measure before the deadline was reached, relying upon statements made to it by union officials that the men would not come in after a specified time. There was no final overt act there by the employer making the employment impossible, as in *Outboard, Marine Co. v. Gordon, supra,* or *Gulf Atlantic Warehouse Co. v. Bennett,* 51 So. 2d 544 (Ala.). Cf. *Department of Industrial Relations v.*

*Savage,* 82 So. 2d 435, 439 (Ala.), recognizing an employer's right to take appropriate action to protect its property after a threat of a strike. As a practical matter, in the instant case, if the employer had failed to secure its equipment before the close of the working day on June 20, it would have had no means of doing so on Monday, if its workers failed to report. It should not be penalized for doing what reasonable prudence would suggest. Nor, in the absence of a lay-off, do we think that the actions of the management could properly be held to be the real cause of the work stoppage.

In this connection we note that the Board found that "there is not sufficient evidence in this case to warrant a finding that the employees of Lloyd E. Mitchell, Inc., deliberately refused to cross the picket lines of the steel workers, nor to accept work that was available to them. The doubt that arises in this case must be resolved in favor of the claimants." This is an incorrect statement of the applicable rule of law. The burden of proof was upon the claimants, as we have noted. Nor can we agree that there was no evidence that the failure to report was due to the absence of passes. There was at least a strong inference that it was. The evidence that work was available is uncontradicted. We think the Board's finding was not supported by the evidence. The minor conflicts in the testimony did not go to the heart of the case. The order of the Superior Court affirming the Board's decision must be reversed, and the case remanded for the passage of an order disallowing the claims.

*Order reversed, with costs.*