738 A.2d 856

**GIANT FOOD, INC.**

v.

**DEPARTMENT OF LABOR, LICENSING
AND REGULATION et al.**

**No. 15, Sept. Term, 1999.**

Court of Appeals of Maryland.

Oct. 7, 1999.

Roger W. Titus (Mitchell Y. Mirviss, John A. Roberts, Kathleen E. Wherthey of Venable, Baetjer and Howard, LLP, Rockville and Harry W. Burton of Morgan, Lewis & Bockius, LLP, Washington, DC, all on brief), for petitioner.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland and Matthew W. Boyle, Asst. Atty. Gen., Baltimore, Daniel G. Orfield of Zwerdling, Paul, Leibig, Kahn, Thompson & Wolly, P.C., Washington, DC, John R. Mooney and Mark J. Murphy, Mooney, Green, Baker, Gibson

and Saindon, P.C., Washington, DC and Jonathan G. Axelrod, Barbara Kraft and Hugh J. Beins of Beins, Axelrod & Kraft, P.C., Washington, DC, all on briefs), for respondents.

Dianna M. Louis, Carey R. Butsavage, Marc A. Stefan, Butsavage & Associates, Washington, DC, amicus curiae on behalf of respondent Commercial Workers, Local 400.

David A. Skomba, Rudolph L. Rose, Anthony G. Lardieri, Semmes, Bowen & Semmes, Baltimore, amicus curiae on behalf of Bell Atlantic-Maryland, Inc., Safeway, Inc., petitioner.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI, (retired, specially assigned), JJ.

CATHELL, Judge.

Giant Food, Inc., petitioner, appeals from a decision of the Court of Special Appeals affirming an administrative ruling that certain of petitioner's employees were entitled to unemployment benefits during a work stoppage caused by a strike from December 15, 1996 to January 18, 1997. We hold that the employees are not entitled to the unemployment benefits and shall reverse.

## I.   Background

Petitioner is a retail grocer which owns and operates two distribution and warehouse centers in Jessup, Maryland and Landover, Maryland. It also owns and operates a beverage plant and ice cream plant in Jessup, a dairy in Landover, and a bakery in Silver Spring, Maryland. Respondent Teamsters Local 639 consists of the truckers who deliver products from those two distribution and warehouse centers to all of petitioner's 174 stores in the Mid–Atlantic region.

The strike at issue in this case began when the collective bargaining agreement between petitioner and respondent Teamsters Local 639 expired and the local went on strike. The remaining union locals appearing as respondents in this case assisted in the strike either by actively refusing to cross

picket lines or engaging in "sympathy strikes."[1] As a result of the strike, petitioner's warehouse and distribution centers ceased operations as did the various manufacturing plants. Petitioner responded to the closings by having other wholesalers and suppliers ship products directly to its retail stores. The record also reflects that they overstocked products in anticipation of the strike. Petitioner estimates that it lost approximately four million dollars in profits from the closing of the plants.

The 1,346 employees participating or assisting in the strike applied for unemployment benefits for the period during which they were out of work. After a hearing, the Board of Appeals of the Department of Labor, Licensing, and Regulation (Board), also a respondent to this appeal, ruled that the employees were entitled to the benefits. On judicial review, the Circuit Court for Montgomery County affirmed. The Court of Special Appeals affirmed the circuit court. *See generally Giant v. Department of Labor, Licensing & Reg.,* 124 Md.App. 357, 722 A.2d 398 (1999).

## II. Standard of Review

Our review of an agency's decision "entails only an appraisal and evaluation of the agency's fact-finding and not an independent decision on the evidence." *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749, 753 (1998); *see Anderson v. Department of Pub. Safety &*

---

1. Those respondents are: (1) Teamsters Local 730, consisting of warehouseman and cardboard salvage workers at the warehouses, janitors at the bakery, employees at an ice plant operated by petitioner, and cafeteria staff at petitioner's corporate offices; (2) Teamsters Local 67, which represents employees at the beverage plant; (3) Teamsters Local 355, which represents truck drivers delivering pharmaceuticals to the retail stores; (4) Teamsters Local 922, consisting of cardboard salvagers, and garage and maintenance employees; (5) Teamsters Local 246, consisting of the employees at the dairy and ice cream plants, and truckers who deliver baked goods from the Silver Spring plant to the distribution centers and to the retail stores; (6) Bakery, Confectionary and Tobacco Workers International Union, Local 118, which represents employees in the Silver Spring bakery. Local 118 also represents bakery workers at the individual retail stores, who apparently were not involved in the strike.

*Correctional Servs.,* 330 Md. 187, 212, 623 A.2d 198, 210 (1993). When the agency is acting in a fact-finding or quasi-judicial capacity, we review its decision to determine "whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner." *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 224, 334 A.2d 514, 523 (1975); *see Goodwich v. Nolan,* 343 Md. 130, 148, 680 A.2d 1040, 1049 (1996); *Weiner v. Maryland Ins. Admin.,* 337 Md. 181, 190, 652 A.2d 125, 129 (1995). When dealing with factual issues, "[w]e are also obligated to 'review the agency's decision in the light most favorable to the agency,' since their decisions are *prima facie* correct and carry with them the presumption of validity." *Catonsville Nursing Home,* 349 Md. at 569, 709 A.2d at 753 (quoting *Anderson,* 330 Md. at 213, 623 A.2d at 210; *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119, 1124 (1978)). We have noted that our review of an administrative agency's fact-finding decisions differs markedly from our review of the decision of a trial court:

> In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.

*United Steelworkers v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984).

We have stated that, "[a] court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994), *quoted in Bucktail, LLC v. County Council,* 352 Md. 530, 552–53, 723 A.2d 440, 450 (1999); *see also Prince George's County v. Brown,* 334 Md. 650, 658, 640 A.2d 1142, 1146 (1994); *Catons-*

*ville Nursing Home,* 349 Md. at 569, 709 A.2d at 753 (quoting *Insurance Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474, 479 (1997)); *People's Counsel v. Maryland Marine Mfg. Co.,* 316 Md. 491, 497, 560 A.2d 32, 34–35 (1989).

In the case *sub judice,* the factual determinations of the Board are generally not in contest. Thus, our review of the administrative agency's decision below is strictly concerned with whether their decision was based on proper legal standards.

## III. Analysis

The issue before the Court, in general terms, is whether respondents were disqualified from receiving the requested unemployment benefits under Maryland Code (1991), section 8–1004 of the Labor and Employment Article. Section 8–1004 states:

(a) *Grounds for disqualification.*—Except as provided in subsection (b) of this section:

(1) an individual who otherwise is eligible to receive benefits is disqualified from receiving benefits for each week for which the Secretary finds that *unemployment results from a stoppage of work, other than a lockout, that exists because of a labor dispute at the premises where the individual last was employed;* and

(2) if separate branches of work that usually are conducted as separate businesses in separate premises are conducted in separate departments on the same premises, each department shall be considered a separate premises for the purposes of this subsection.

(b) *Exception.*—A disqualification under this section does not apply to an individual who satisfies the Secretary that the individual:

(1) is not participating in, financing, or directly interested in the labor dispute that caused the stoppage of work; and

(2) does not belong to a class or grade of workers that, immediately before the stoppage, had any members:

(i) employed at the premises; and

(ii) participating in, financing, or directly interested in the labor dispute. [Emphasis added.]

More specifically, the parties debate whether the "stoppage of work" required by subsection (a)(1) must be "at the premises where the individual last was employed." The statute clearly requires there to be a "labor dispute" at the premises where the employees worked and there is no question in this case that there was a labor dispute at the various sites where petitioner's employees struck.[2] Respondents, who interpret section 8–1004(a)(1) as not limiting the stoppage of work to each individual "premises" of petitioner's business, argue that there was no work stoppage because petitioner's business as a whole was not "substantially curtailed." Petitioner argues that subsection (a)(1) does apply the "stoppage of work"

---

**2.** The Bakers Union impliedly argues that there was no labor dispute at the premises where they worked. They argued to the Board that they were exempted from disqualification by section 8–1004(b). Despite their ruling that all of the claimants were entitled to benefits, the Board's opinion did address this issue:

The non-[Local ]639 Claimants failed to prove that they met the exemption set out in [Labor & Employment Article], § 8–1004(b). The Board finds their evidence on this issue to be totally lacking in credibility. The Board further finds that there was overwhelming evidence in the record to support a conclusion that they all belonged to a class or grade of workers that had members who were employed at the premises of Giant Food and who were participating in and directly interested in the labor dispute.

There was a labor dispute at the bakery and other manufacturing plants because the employees at those premises engaged in a sympathy strike. Generally, participants in a sympathy strike are not entitled to unemployment benefits because courts view sympathy strikes or the refusal to cross picket lines as voluntary participation in the labor dispute. See Baltimore Typographical Union No. 12 v. Hearst Corp., 246 Md. 308, 321, 228 A.2d 410, 417 (1967); Lloyd E. Mitchell, Inc. v. Maryland Employment Sec. Bd., 209 Md. 237, 243, 121 A.2d 198, 201 (1956); Tucker v. American Smelting & Ref. Co., 189 Md. 250, 258–59, 55 A.2d 692, 696 (1947); Brown v. Maryland Unemployment Compensation Bd., 189 Md. 233, 243–44, 55 A.2d 696, 701–02 (1947); see also, e.g., McKinley v. California Employment Stabilization Comm'n, 34 Cal.2d 239, 244, 209 P.2d 602, 606 (1949); General Elec. Co. v. Review Bd., 173 Ind.App. 457, 461, 364 N.E.2d 142, 145 (1977); Trans World Airlines v. Labor & Indus. Relations Comm'n, 627 S.W.2d 335, 339 (Mo.Ct.App.1982); Aitken v. Board of Review, 136 N.J.L. 372, 374, 56 A.2d 587, 588–89 (N.J.1948).

language to each individual premises and thus, because its business was substantially curtailed at each of the distribution and warehouse centers and the manufacturing plants, those facilities experienced a work stoppage. The parties also debate the exact meaning of "premises" in their respective attempts to broaden or limit the geographic scope of the statute. Petitioner argues that premises refers to each individual unit of employment while respondents argue that it refers to petitioner's facilities as a whole.

## A. Rules of Statutory Construction

This Court has stated repeatedly that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought in the first instance in the actual language of the statute. *Board of License Comm'rs v. Toye*, 354 Md. 116, 122, 729 A.2d 407, 410 (1999); *Anne Arundel County v. City of Annapolis*, 352 Md. 117, 123, 721 A.2d 217, 220 (1998); *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks*, 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck*, 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss*, 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, when the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Toye*, 354 Md. at 122, 729 A.2d at 410; *Anne Arundel County*, 352 Md. at 123, 721 A.2d at 220; *Marriott Employees*, 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County*, 248 Md. 403, 414, 237 A.2d 35, 41 (1968); *see also Brodsky v. Brodsky*, 319 Md. 92, 98, 570 A.2d 1235, 1237 (1990) ("In construing a statute, we look first to its language, . . . we assume that the words of the statute are intended to have their natural, ordinary and gener-

ally understood meaning in the absence of evidence to the contrary.").

This Court in *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 73–75, 517 A.2d 730, 731–32 (1986) opined:

> In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention. The primary source of legislative intent is, of course, the language of the statute itself.... Of course, where statutory provisions are clear and unambiguous, no construction or clarification is needed or permitted, it being the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation.
>
> . . . .
>
> That a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled....
>
> . . . .
>
> ... We ... recognize the rule that where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment.... [T]he court ... may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense. [Citations omitted.]

Finally, in *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992), this Court opined, in reference to construing a statute:

> While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within

which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. [Citations omitted.]

### B. Legislative History of Section 8–1004

Turning to the legislative history, section 8–1004 was transferred from Maryland Code (1957, 1985 Repl.Vol.), Article 95A, section 6(e), in 1991 when the current Labor and Employment Article was adopted.[3] Prior to the transfer, section 6 read:

An individual shall be disqualified for benefits:

. . . .

(e) *Stoppage of work because of labor disputes.*—For any week with respect to which the Executive Director finds that his unemployment is due to a stoppage of work, other than a lockout, which exists because of a labor dispute at *the factory, establishment, or other premises* at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Executive Director that—

(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the pur-

---

3. All references to "section 8–1004" shall mean Maryland Code (1991), section 8–1004 of the Labor & Employment Article and all references to "section 6" shall mean Maryland Code (1957, 1985 Repl.Vol.), Article 95A, section 6.

poses of this subsection, be deemed to be a separate factory, establishment, or other premises. [Emphasis added.]

The Legislature, in the transfer between Code volumes, replaced the words "factory, establishment, or other premises" with "premises."

■ The legislative history provides no express statement as to why that change was made. A report to the Legislature, in describing the transfer of former section 6 into subtitle 10 of the Labor & Employment Article, does not discuss former section 6(e) or current section 8–1004. *See* Department of Legislative Reference, Report on H.B. 1, at 32 (Jan. 14, 1991). The report does indicate, however, that "the primary purposes of the [revision] are modernization and clarification, not policymaking. . . . Every effort is made to ensure that a proposed revision conforms as nearly as possible to the intent of the General Assembly, and all these revisions are highlighted in the appropriate revisor's notes." *Id.* at 1. The revisor's note accompanying section 8–1004 notes that "[t]his section is new language derived *without substantive change* from former Art. 95A, § 6(e)." [4] (Emphasis added.) In addition, this Court "consistently has presumed that general recodifications of statutes, such as . . . the Labor & Employment Article, are for the purpose of clarity only and not [for] substantive change, unless the language of the recodified statute unmistakably indicates the intention of the Legislature to modify the law." *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 444, 677 A.2d 73, 79 (1996); *see also Duffy v. Conaway*, 295 Md. 242, 257–58, 455 A.2d 955, 962–63 (1983); *In Re: Special Investigation No. 236*, 295 Md. 573, 576–77, 458 A.2d 75, 76 (1983); *Bureau of Mines v. George's Creek Coal & Land Co.*, 272 Md. 143, 155, 321 A.2d 748, 754–55 (1974); *Welch v. Humphrey*, 200 Md. 410, 417, 90 A.2d 686, 689 (1952). Thus, we interpret the term

---

4. "It is a well-settled practice of this Court to refer to the Revisor's Notes when searching for legislative intent of an enactment." *Dean v. Pinder*, 312 Md. 154, 163, 538 A.2d 1184, 1189 (1988). "The practice of considering revision commission reports in searching for legislative intent is too well established to be open to question." *Allers v. Tittsworth*, 269 Md. 677, 683, 309 A.2d 476, 480 (1973).

"premises" in current section 8–1004 as the equivalent of its earlier limitation in section 6(e) to "the factory, establishment, or other premises" where the employees worked, i.e., the individual site of their employment. This interpretation of "premises" complies with the plain and simple definition given to the word. *The Random House Dictionary of the English Language* 1136 (unabr. ed.1983), for instance, defines premises as: "**a.** a tract of land including its buildings. **b.** a building together with its grounds or other appurtenances. **c.** the property forming the subject of a conveyance or bequest."

In addition to our interpretation of Maryland legislative history, this Court has previously analyzed the English statute pertaining to labor dispute unemployment disqualifications to evaluate our own version of the same provision. Maryland's unemployment insurance statutes were "passed by the General Assembly in 1936 to alleviate the consequences of widespread involuntary unemployment caused by the depression." *Employment Security Admin. v. Browning–Ferris, Inc.*, 292 Md. 515, 517, 438 A.2d 1356, 1358 (1982). Those provisions were patterned after portions of a federal Social Security Draft Bill pertaining to unemployment compensation. Most of that statute, including the labor dispute disqualification, was derived from the English unemployment statutes. *Id.* at 521–22, 438 A.2d at 1360. This Court noted in *Saunders v. Maryland Unemployment Compensation Bd.*, 188 Md. 677, 687–88, 53 A.2d 579, 583–84 (1947), that the history of the English version of the disqualification provision and its subsequent interpretation were relevant to the interpretation of Maryland's similar statute:

The exception in the English statutes (1920, 10 and 11, Geo. V, Chap. 30, 8–(1), 1935, 25 Geo. V, Chap. 8, 26–(1)) is practically identical with our statute. It reads "An insured contributor who has lost employment by reason of a stoppage of work which was due to a trade dispute at *the factory, workshop, or other premises* at which he was employed shall be disqualified for receiving unemployment benefit so long as the stoppage of work continues, * * * " A practically similar clause is in the 1946 Act. 9 and 10 Geo.

VI, Chap. 67, 13–(1).... [I]t has been held that the contemporaneous construction of the copied statute is intended to be the construction of the copying act. *Lavender v. Rosenheim*, 110 Md. 150, at page 156, 72 A. 669, [671 (1909) ]; *Heyn v. Fidelity Trust Co.*, 174 Md. 639, at page 658, 197 A. 292, 1 A.2d 83, [87 (1938) ]. [Emphasis added.]

Thus, section 8–1004 as derived from the English Act originally limited the scope of the disqualification to the "factory, workshop or other premises" involved. *See* Unemployment Insurance Act, 1935, 25 & 26 Geo. 5, ch. 8, § 26(1) (Eng.). A subsequent revision of the disqualification provision substituted "place of employment" for "factory, workshop or other premises." National Insurance Act, 1965, ch. 51, § 22(I) (Eng.). The National Insurance Act defined place of employment in a separate subsection: "the expression 'place of employment' in relation to any person, means the factory, workshop, farm or other premises or place at which he was employed...." *Id.* § 22(6)(a). That definition remained virtually unaltered until 1995. *See* Social Security Contributions & Benefits Act, 1992, ch. 4, § 27(3)(a) (Eng.); Social Security Act, 1975, ch. 14, § 19(2)(a) (Eng.). The English disqualification provision currently uses the term "place of work," which "in relation to any person, means the premises or place at which he was employed." Jobseekers Act, 1995, § 14(4) (Eng.).[5] The English disqualification statute, since its inception, has maintained a definition of place of employment or work limited to each individual site of employment, not the employer's entire operations. We interpret the Maryland statute similarly.

██ Finally, we note that under subsection (a)(2) of section 8–1004, "if separate branches of work that usually are conducted as separate businesses in separate premises are conducted in separate departments on the same premises, *each department shall be considered a separate premises*

---

5. The 1995 revision restructured the entire labor dispute disqualification provision. The changes do not appear to be substantive and nothing indicates that they are.

. . . ." (Emphasis added). When we examine the plain meaning of the words of a statute, "[o]ur examination of such words is guided by the principle that we should read 'pertinent parts of the legislative language together, giving effect to all of those parts if we can, and rendering no part of the law surplusage.'" *Holman v. Kelly Catering, Inc.,* 334 Md. 480, 485, 639 A.2d 701, 704 (1994) (quoting *Sinai Hosp. v. Department of Employment,* 309 Md. 28, 40, 522 A.2d 382, 388 (1987)); *see also Rose v. Fox Pool Corp.,* 335 Md. 351, 359, 643 A.2d 906, 909–10 (1994) ("[A] statute must be construed as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.") (citing *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 758 (1993); *Maryland Port Admin. v. Brawner Contracting Co.,* 303 Md. 44, 60, 492 A.2d 281, 289 (1985)). Viewing section 8–1004 as a whole, to interpret the word "premises" in subsection (a)(1) as including all sites of an entire multi-site business would render subsection (a)(2) meaningless. Because subsection (a)(2) compares separate branches of work conducted within one premises to separate branches of work typically conducted in different premises, i.e., different work sites, and requires that the separate branches or departments within one facility be treated as individual premises, the Legislature clearly intended for "premises" generally to refer to each individual work site of an employer. We infer from subsection (a)(2) that the Legislature's intent was to apply section 8–1004 to the smallest unit of employment discernable under the facts and circumstances of each case.

Turning to the issue of whether the stoppage of work need only occur at an individual premises under the disqualification provision, we note that former section 6(e)(2) exempted from disqualification those who did not "belong to a grade or class of workers of which, immediately before the commencement of the stoppage, *there were members employed at the premises at which the stoppage occurs,* any of whom are participating in or financing or directly interested in the dispute. . . ." (Emphasis added.) Although this subsection is not directly applicable to the case at bar, we note that it applied only to those

employed "at the premises at which the stoppage occur[red],"
prior to its 1991 recodification in section 8–1004(b)(2). Recall-
ing that section 8–1004(b)(2) was "derived without substantive
change" from section 6(e)(2), the former language from that
exception reflects inferentially that the General Assembly
viewed a stoppage of work as occurring in an individual
premises.

Though this Court has never squarely addressed this issue,
prior comments by this Court reflect that our original inter-
pretation of the disqualification provision was that a stoppage
of work need only occur within an individual premises to
trigger a disqualification. As noted, *supra*, we utilized the
subsequent interpretations of the English Unemployment Act
of 1935 in *Saunders* to review the similar Maryland provision.
Regarding the stoppage of work requirement, we noted the
interpretation of that phrase by the English Umpires, admin-
istrative judges within the British Ministry of Labour:

> The English Umpires who administer the English statutes,
> have handed down a number of administrative decisions
> construing this clause. These decisions are final because
> there is no provision for judicial review.... The English
> Umpires hold that stoppage of work refers primarily not to
> the cessation of an employee's labor, *but to a stoppage of
> work carried on at the premises, factory or workshop in
> consequence of the dispute.* (Umpire's Decisions, 609, 3809,
> 4850–1926.)

*Id.* at 688, 53 A.2d at 584 (emphasis added). *Saunders* also
made similar interpretations of the work stoppage require-
ment in reviewing decisions by courts in two sister states. In
interpreting an Oklahoma case, *Board of Review v. Mid–
Continent Petroleum Corp.,* 193 Okla. 36, 141 P.2d 69 (1943),
we noted "the decision of the court ... only goes so far as to
say that a 'stoppage of work' *does not mean that a whole plant
has to be shut down.*" *Saunders,* 188 Md. at 685, 53 A.2d at
582 (emphasis added). Later, in reviewing *Magner v. Kinney,*
141 Neb. 122, 2 N.W.2d 689 (1942), we noted that "[t]he court
referred to the fact that the unemployment compensation law
was a substantial reenactment of the English [Unemployment]

Insurance Act and that the construction by the English officials administering that act . . . is that 'stoppage of work' is a substantial curtailment of work *in an establishment. . . .*" *Saunders,* 188 Md. at 685–86, 53 A.2d at 583 (emphasis added).

In *Lloyd E. Mitchell, Inc. v. Maryland Employment Security Board,* 209 Md. 237, 121 A.2d 198 (1956), we reviewed a case in which the claimants, though not striking, had not crossed the picket lines. We noted that before a special examiner, "it was stipulated by all the parties that beginning on June 2, 1952, there was a complete stoppage of work at the Sparrows Point plant of the Bethlehem Steel Company." *Id.* at 241, 121 A.2d at 200. For this reason, we had concluded that "[i]t is undisputed that there was a stoppage of work *at their place of employment* due to a labor dispute between other parties, so that the proviso comes into play and the claimants must show affirmatively that they did not participate in the labor dispute." *Id.* at 240, 121 A.2d at 199–200 (emphasis added).

In *MEMCO v. Maryland Employment Security Administration,* 280 Md. 536, 375 A.2d 1086 (1977), we were concerned with whether employees involved in a multi-employer labor dispute were disqualified from receiving unemployment benefits. After labor contract negotiations failed, butchers at a number of grocery stores in the Washington area decided to strike against one of the employers (which, coincidentally, was petitioner) to put pressure on the other employers. The employers subsequently "locked out" all of the butchers. We held, *inter alia,* that the "factory, establishment, or other premises" where the labor dispute had occurred was each "individual place of employment, not [the] multi-employer association." *Id.* at 545, 375 A.2d at 1092. We also held that "the *stoppages* of work were directly caused by the employers' *lockouts.*" *Id.* at 549, 375 A.2d at 1094 (emphasis added). By using the plural "stoppages" and "lockouts," we infer that *MEMCO* viewed a work stoppage as occurring at each individual grocery store, i.e., each premises, once the "lockouts" at each site began.

Finally, in *Browning–Ferris*, 292 Md. at 522, 438 A.2d at 1360, we quoted Milton I. Shadur, *Unemployment Benefits and the Labor Dispute Disqualification*, 17 U. Chi. L.Rev. 294, 308 (1950), which notes:

> Like most other aspects of the Draft Bill, the stoppage of work requirement had its origin in the British Unemployment Insurance Acts. When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring "not to the cessation of the workman's labour, *but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed.*" [Emphasis added.]

Since its passage, our understanding of the operation of the labor disqualification provision has been that, in order for claimants to be disqualified from receiving benefits, there must be both a labor dispute and a work stoppage at the individual place, site, factory, workshop, establishment, or premises where they worked.

Respondents cite numerous cases in which courts of other states have applied a standard of "substantial curtailment" of the employer's entire operations to determine whether there has been a work stoppage. We noted in *Browning–Ferris* that

> [m]ost jurisdictions hold that "stoppage of work" means a substantial curtailment of the employer's operations.... However, the difficulty of applying a fixed percentage rule to define "substantial" has led courts to consider various other factors:
>
> > "Since the mid-fifties, there has been a new emphasis placed upon the term 'operations.' *As production increasingly represents less than totality of the employing unit's performance, decreases in business revenue, services rendered, marketing, research, and maintenance, transportation, and construction activities have come to the fore as indicia of substantialness.*"

292 Md. at 528–30, 438 A.2d at 1364–65 (emphasis added) (footnotes omitted) (quoting Willard A. Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence*, 45 J. Urb. L. 319, 332 (1967)). Thus, the original intent of the "substantial curtailment" test may have been not to increase the geographic scope of the disqualification provision, as respondents allege, but to expand the criteria from industrial production to other business-related factors in determining whether a work stoppage had occurred at the individual work site.[6] *See, e.g., Cumberland & Allegheny Gas Co. v. Hatcher*, 147 W.Va. 630, 638, 130 S.E.2d 115, 120 (1963) (" '[S]toppage of work' as used in statutes of this nature is held to refer to the employer's *plant* operations ... and to mean a substantial curtailment of work or operations *in the employing establishment* ...." (emphasis added)), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982). In other words, whether operations have been substantially curtailed at a particular job site depends on the type of business the employer conducts there and on the specific facts and circumstances of the case. *See Twenty–Eight (28) Members of Oil, Chem., & Atomic Workers Union v. Employment Security Div.*, 659 P.2d 583, 591, 592 (Alaska 1983); *Continental Oil Co. v. Board of Labor Appeals*, 178 Mont. 143, 155, 156, 582 P.2d 1236, 1243, 1244 (1978). In this case, the main purpose of each work site was to either produce grocery products or store and distribute them. Not

---

**6.** We also note that Shadur, *supra*, at 311–12, proposed using a test similar to respondents' interpretation of "substantial curtailment" to address when a specific department within a premises is engaged in a labor dispute. Most disqualification provisions require that "if separate branches of work that usually are conducted as separate businesses in separate premises are conducted in separate departments on the same premises, each department shall be considered a separate premises for the purposes of this subsection." *See, e.g.,* § 8–1004(a)(2). Shadur, *supra*, at 311–12, finding this provision "troublesome," proposed that the work stoppage of the department be evaluated as to whether it "was substantial in relation to the *entire* establishment's production, not merely to that of the department in which the dispute occurred." We disagree with that interpretation as it clearly violates the statute on its face—each subunit of employment must "be considered a separate premises" under subsection (c)(2). *See supra.*

only were these activities substantially curtailed, they completely ceased at each location. Thus, a stoppage of work occurred at each of these premises. *Cf. Continental Oil Co.,* 178 Mont. at 156, 582 P.2d at 1244 ("[I]n determining whether there is a stoppage of work at a plant ... engaged in the production of a final product or set of final products, the first and major measure must be whether such production is curtailed or stopped.").

Respondents also urge us to apply a multi-site definition of "premises" in this case based on the "functional integrality" and "general unity" tests we discussed in *Tucker v. American Smelting & Refining Co.,* 189 Md. 250, 256, 55 A.2d 692, 694–95 (1947). We note that *Tucker,* though not expressly rejecting those tests, refused to use them in that case because "in the ordinary use of words a plant at Garfield[, Utah] and one at Baltimore would not be called one 'establishment' and facts are lacking which might give a special and unusual application to the word 'establishment.'" *Id.* We again find those tests useless in the case at bar because the facts are not so "special and unusual" as to require their application. *Cf. Matson Terminals, Inc. v. California Employment Comm'n,* 24 Cal.2d 695, 707, 151 P.2d 202, 208 (1944) (equating "establishment" to all work sites covered by a union contract because hiring and work assignments were conducted through the union halls); *Abendroth v. Wisconsin Dep't of Indus., Labor & Human Relations,* 69 Wis.2d 754, 764, 233 N.W.2d 343, 348 (1975) (rejecting an argument founded on functional integrality and general unity tests that airline ground employees in Wisconsin worked in the same establishment as pilots in Seattle and Minneapolis). There clearly was a stoppage of work at each individual premises where the respondents worked. The remainder of petitioner's operations are irrelevant to that determination in this case.

## C. Interpretation by Other States

When Maryland statutes are adopted around the same time as similarly-worded statutes in other states, this Court has looked to judicial interpretation of those foreign statutes as

persuasive authority. *See St. Joseph Hosp. v. Quinn,* 241 Md. 371, 377, 216 A.2d 732, 735 (1966); *Public Service Comm'n v. Baltimore Transit Co.,* 207 Md. 524, 534, 114 A.2d 834, 838 (1955); *Continental Oil Co. v. Horsey,* 177 Md. 383, 385, 9 A.2d 607, 608 (1939). That courts of other states have interpreted the disqualification statute as examining "stoppage of work" in relation to an individual premises bolsters our interpretation of Maryland's version of the unemployment benefits law. The Supreme Court of Hawaii, for instance, reviewed whether a work stoppage had occurred at an airport and at a separate ticket office in *Ahnne v. Department of Labor & Industrial Relations,* 53 Haw. 185, 489 P.2d 1397 (1971). The court first noted that "[t]he sole issue before us is whether during the strike there was 'stoppage of work' at the 'establishment or other premises' of Qantas, where the employees were last employed...." *Id.* at 187, 489 P.2d at 1399. Turning to the history behind the disqualification statute, the court noted that "[t]he British courts ... quickly interpreted the phrase 'stoppage of work' to refer 'not to the cessation of the workman's labor, but to a stoppage of work carried on in the factory, workshop or other premises at which the workman is employed.'" *Id.* at 188, 489 P.2d at 1399. In addition, the court itself had previously held that "'stoppage of work' means a 'substantial curtailment of the business activities *at the employer's establishment* rather than unemployment on the part of the striking employee.'" *Id.* at 189, 489 P.2d at 1400 (emphasis added) (quoting *Meadow Gold Dairies–Hawaii, Ltd. v. Wiig,* 50 Haw. 225, 227–28, 437 P.2d 317, 319 (1968); *Inter–Island Resorts v. Akahane,* 46 Haw. 140, 148, 377 P.2d 715, 720 (1962)). The court ultimately held that there was a substantial curtailment of "activities" at the ticket office, but not of the "overall business activities at the airport establishment." *Id.* at 192–94, 489 P.2d at 1402–03.

The Supreme Court of Nebraska is in accord. In *IBP, Inc. v. Aanenson,* 234 Neb. 603, 609, 452 N.W.2d 59, 64 (1990), the court was

not persuaded by the lockout claimants' argument that the word "establishment," as used in the disqualification section,

should be so broadly construed in the case before us as to encompass the entire multiplant operations of IBP. In defining "factory, establishment, or other premises" for the purpose of ascertaining whether a stoppage of work existed ... "establishment" and "premises" "are so commonly understood as units of place that further definition is superfluous."

The court also noted that it had previously held "that a work stoppage exists when it is proven that there has been a substantial curtailment of work produced by a labor dispute in an employing establishment." *Id.* at 610–11, 452 N.W.2d at 64 (citing *George A. Hormel & Co. v. Hair,* 229 Neb. 284, 426 N.W.2d 281 (1988); *Magner,* 141 Neb. 122, 2 N.W.2d 689); *see also Magner,* 141 Neb. at 130, 2 N.W.2d at 693 (noting that a "stoppage or curtailment of work" may occur in one of three forms: (1) total cessation of work in the premises; (2) cessation of work by part of the employees, which prevents others in the premises from working; or (3) diminished patronage by customers, which produces unemployment).

The appellate courts of Illinois have also consistently equated stoppage of work to a substantial curtailment of business within each individual premises, not the employer's business as a whole. *See Central Foundry Div. v. Holland,* 36 Ill. App.3d 998, 1002, 345 N.E.2d 143, 147 (1976) ("Stoppage of work refers 'to a stoppage of work of the plant or particular department of a plant and not to the individual unemployment of the worker or workers.'") (quoting *Robert S. Abbott Publ'g Co. v. Annunzio,* 414 Ill. 559, 569, 112 N.E.2d 101, 106 (1953)); *Be–Mac Transp. Co. v. Grabiec,* 20 Ill.App.3d 345, 351, 314 N.E.2d 242, 247 (1974) (same); *Walgreen Co. v. Murphy,* 386 Ill. 32, 37, 53 N.E.2d 390, 393 (1944) (holding that there was a work stoppage at a warehouse because of a "shutdown substantially interfering with warehouse operations, curtailing them to approximately twenty per cent of normal production."). The appellate courts of Missouri are in accord. *See O'Dell v. Division of Employment Security,* 376 S.W.2d 137, 142, 145 (Mo.1964) (noting that premises means "the place, location or situs of the claimant's employment"; thus, two

factories within the same complex were a single employing unit where the claimants had stopped work); *Kroger Co. v. Industrial Comm'n,* 314 S.W.2d 250, 254 (Mo.Ct.App.1958) ("[T]he significant word of the phrase 'at the factory, establishment or other premises . . .' is the word 'premises,' it being the purpose of such phrase to fix the place of the work stoppage and labor dispute on which the claim is predicated."). *See also Blakely v. Review Bd.,* 120 Ind.App. 257, 267, 90 N.E.2d 353, 358 (1950) ("A stoppage of work commences at the plant of the employer when a definite check in production operations occurs." (quoting *Carnegie–Illinois Steel Corp. v. Review Bd.,* 117 Ind.App. 379, 72 N.E.2d 662 (1947))); *Shell Oil Co. v. Brooks,* 88 Wash.2d 909, 913, 567 P.2d 1132, 1134 (1977) (" '[S]toppage of work' is most often defined in terms of a substantial curtailment of the employer's overall operations at the particular situs in question."). Finally, we note that Lewis, *supra,* at 343, summarized the case law with a similar interpretation to that which we adopt today:

> The general rules in stoppage of work jurisdictions, as they have been judicially construed, are: benefits will be denied for any week during which (1) a claimant-striker will not perform available work and *there is a substantial curtailment of production or operations at the employer's establishment which curtailment would not exist but for a labor dispute at said establishment . . . .* [Emphasis added.]

We also note that other courts in our sister states have interpreted the term premises or related terms as meaning a single unit of employment. In *Walgreen Co.,* 386 Ill. at 39, 53 N.E.2d at 394, for instance, the Supreme Court of Illinois held that Illinois' disqualification provision "makes every 'factory, establishment, or other premises' a unit for the purpose of ascertaining whether a stoppage of work due to a labor dispute exists." The Indiana Appellate Court held in *Blakely,* 120 Ind.App. at 275, 90 N.E.2d at 361, that the disqualification provisions "render ineligible for benefits the employees of a separate department of an employer's business when a labor dispute between such employees and the employer has caused a work stoppage which resulted in a curtailment or complete

stoppage of work in such department." The New York Supreme Court, Appellate Division, has followed this limited definition of premises or, in their statute, "establishment," consistently. *See In re Falco-Ward,* 129 A.D.2d 929, 930, 514 N.Y.S.2d 568, 569 (1987); *DiLella v. Levine,* 48 A.D.2d 91, 93, 368 N.Y.S.2d 300, 302 (1975); *Machcinski v. Ford Motor Co.,* 277 A.D. 634, 643, 102 N.Y.S.2d 208, 216 (1951). *See also George Hunt Constr. Co. v. Florida Dep't of Commerce,* 271 So.2d 19, 20 (Fla.Dist.Ct.App.1972) (holding that one of the employer's many construction sites constituted an "establishment"); *Snook v. International Harvester Co.,* 276 S.W.2d 658, 660 (Ky.1955) (noting that "establishment," as used in the statute, "has no special or technical meaning" and can be defined as "a fixed geographical 'place'."); *Abnie v. Ford Motor Co.,* 175 Ohio St. 273, 275, 194 N.E.2d 136, 138 (1963) ("The word, 'establishment,' has a clear and natural meaning as a distinct physical place of business."); *Abbott v. Employment Sec. Dep't of State,* 27 Wash.App. 619, 623, 621 P.2d 734, 736 (1980) (holding that "premises" means "each individual jobsite.").[7]

## D. Resolution

Applying this reasoning to the case at hand, it is clear that there was a stoppage of work at the distribution and warehouse centers and each of petitioner's manufacturing plants where sympathy strikes took place. The Board, in its opinion, found that (1) petitioner could not operate its warehouse and distribution centers; (2) "[t]he ice cream plant, beverage plant and dairy remained closed down during the strike"; and (3) the bakery remained closed during three weeks of the strike. Under section 8–1004, there was a "substantial curtailment" of

---

**7.** In addition, one scholar has equated the "factory, establishment, or other premises" clause in the unemployment disqualification statute to the term "establishment," which, under the Fair Labor Standards Act, has been "interpreted as one particular business premises" by both federal regulators and the courts. *See* Jerre S. Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 Vand. L.Rev. 338, 347 (1955).

operations at each of these premises to cause a "stoppage of work."

Respondent Teamsters Local 639 argues that the various distribution and warehouse centers and manufacturing plants were not their place of "last employment." We disagree because those facilities were their centralized place of employment. The truckers admit in their brief that each trucker reports for work at one of these facilities, loads his or her truck there, departs from the individual site prior to servicing petitioner's many stores, and then returns to the site at the end of his or her working day. We note that courts in our sister states, posed with similar arguments, have made the same conclusion. *See Noblit v. Marmon Group—Midwest Foundry Div.*, 25 Mich.App. 432, 437, 181 N.W.2d 593, 595 (1970) (holding that truck drivers who picked up items from a foundry and returned there at the end of the day were "last employed" there), *aff'd*, 386 Mich. 652, 194 N.W.2d 324 (1972); *Alldredge v. Archie*, 93 Nev. 537, 541, 569 P.2d 940, 943 (1977) (holding that pilots based out of a Las Vegas airport were "last employed" at that location); *Basso v. News Syndicate Co.*, 90 N.J.Super. 150, 164–65, 216 A.2d 597, 605 (App.Div. 1966) (holding, *inter alia*, that newspaper employees who operated in the field but took orders from the New York City office, attended meetings there, and were paid there, were "employed" there); *In re Falco–Ward*, 129 A.D.2d at 930, 514 N.Y.S.2d at 569–70 (rejecting flight attendants' argument that their place of employment was the employer's aircraft and not the airport in which they were based).[8]

---

8. The same argument applies to respondent Teamsters Local 355. Their last place of employment was the pharmaceuticals warehouse from which they operated in Baltimore. The Board did not address whether work had stopped at that warehouse. The record does contain evidence that operations at that warehouse had been substantially curtailed. (*See* memorandum from petitioner to the Board of 2/6/97, at 1.) We will assume that operations were substantially curtailed at that location without drivers to deliver the pharmaceuticals from the warehouse to petitioner's stores. Teamsters Local 355 has not cited any evidence or made any argument to the contrary.

## IV.   Preservation of Issues

We briefly address respondents' argument that, before the Board, petitioner failed to preserve the arguments they have presented to this Court and both courts below.   The record contains evidence to the contrary.   For instance, in his opening statements to the Board, counsel for petitioner claimed "that there was a substantial curtailment of Giant Food's operations during the strike.   Virtually, as you will hear, the warehouses were essentially shut down which are a major portion of Giant's operation.   The manufacturing operations at Giant were essentially shut down."   In its post-hearing brief to the Board, petitioner also argued it had "demonstrated a substantial curtailment of at least four aspects of its operations, each of which *alone* would constitute a stoppage of work under the applicable precedent."   Two of those "aspects" alleged by petitioner to have been substantially curtailed were its manufacturing plants and the distribution and warehouse centers.   That petitioner cited its general loss of sales and having to find a substitute for its in-house distribution system as the two other "aspects" of substantial curtailment does not prove that they waived the argument they now present to this Court.   Rather, it reflects that petitioner presented both theories to the Board—that a stoppage of work occurred at each of the various premises and that a curtailment of all of petitioner's operations equated to a work stoppage.   The voluminous testimony in the record reflects that petitioner had been attempting to prove both theories during the hearing. Petitioner preserved the current issue for judicial review and appeal.

## V.   Conclusion

We hold that the term "stoppage of work" refers to the substantial curtailment of work at each individual facility, premises, or individual department within such a facility. Generally under section 8–1004 there must be a stoppage of work at the individual premises where a labor dispute has occurred for an employee at such individual premises to be disqualified from receiving unemployment benefits.   Because

operations ceased at the various premises in which the employees worked in this case, there was a "stoppage of work" at each of those locations caused by the labor dispute in question. Thus, none of the employees are entitled to unemployment benefits. Accordingly, we reverse the decision of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO DIRECT THAT COURT TO REVERSE THE DECISION OF THE BOARD OF APPEALS; RESPONDENTS TO PAY THE COSTS EQUALLY IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**